IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

SCHWOB ENERGY SERVICES, LLC,

      Plaintiff,

v.                                       Case No. 22-00084-JWB

MATRIX PDM ENGINEERING, INC.,

      Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on cross-motions for partial summary judgment (Docs. 81, 87), three motions to strike expert testimony (Docs. 83, 84, 85), and a motion to strike a portion of a reply brief. (Doc. 104.) The motions have been fully briefed and are ripe for decision. (Docs. 81, 83, 84, 85, 87, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105.) Plaintiff's motion for partial summary judgment (Doc. 81) is GRANTED IN PART and DENIED IN PART. Defendant's motion for partial summary judgment (Doc. 87) is GRANTED IN PART and DENIED IN PART. Plaintiff's motions to strike (Docs. 83, 84) are DENIED. Defendant's motion to strike (Doc. 85) is DENIED. Defendant's motion to strike a portion of Plaintiff's reply brief (Doc. 104) is DENIED.

I.    **Facts and Procedural History**

On February 22, 2022, Schwob Energy Services, LLC ("Plaintiff" or "Schwob"), initiated this breach of contract lawsuit against Matrix PDM Engineering, Inc. ("Defendant" or "Matrix") for an alleged breach of a subcontractor agreement arising out of Matrix's construction of a gas compressor station for a pipeline project in Rangely, Colorado. (Doc. 2 at 3.) Defendant filed a counterclaim for breach of contract on May 18, 2022. (Doc. 31.) After years of back-and-forth

1

briefing, settlement negotiations, and discovery, the parties have filed cross motions for partial summary judgment, with each party recognizing that certain fact issues remain for trial. (Docs. 81, 87.) The parties have engaged experts to determine the reasonableness of possible damages. Plaintiff has filed motions to strike the testimony of two of Defendant's expert witnesses. (Docs. 83, 84.) Defendant has filed a motion to strike the testimony of one of Plaintiff's witnesses. (Doc. 85.) In addition, Defendant has filed a motion to strike a portion of Plaintiff's reply brief concerning its motion to strike. (Doc. 104.)

Schwob and Matrix entered into their subcontract agreement on October 1, 2020. (Doc. 81-2 at 2.) Under the subcontract, Matrix would place purchase orders with Schwob to complete work. (*Id.* at 3.) The purchase order placed under the subcontract is the subject of this lawsuit. (Doc. 87 at 15-16; Doc. 97 at 1-2.) The purchase order indicated that Matrix was to pay Schwob a fixed price sum of $6,670,624 (Doc. 96-5 at 2), plus the cost of any construction change orders. The subcontract price was to be paid out over a series of milestones as the project was completed. (*Id.*) This milestone system was referred to as the "Rules of Credit." (*Id.*) At each milestone, Schwob executed a waiver of claims for payment regarding the work performed on the project up to the date of the waiver. *See, e.g.*, (Doc. 87-8 at 5-6.)

On January 19, 2022, Matrix invoked its rights under Article 16.1 of the subcontract and terminated Schwob for convenience. (Doc. 81-3 at 2-3.) At the time of termination, Schwob believes it was 51% complete on the project, while Matrix believes the completion stood at 43%. (Doc. 87 at 11; Doc. 96 at 6.) Before terminating Schwob for convenience, Matrix considered terminating Schwob for default, under Article 15.1, due to alleged defects in Schwob's performance. (Doc. 81-5 at 5-7.) On February 11, 2022, Schwob, pursuant to the termination-for-convenience clause, sent Matrix a final invoice for "reasonable costs" Schwob had allegedly

incurred and was owed under the subcontract's termination-for-convenience clause. (Doc. 81-4 at 2.) The amount due on the invoice totaled $5,833,910.65. (*Id.*) Matrix refused to pay Schwob any portion of its invoice. (Doc. 81 at 4; Doc. 96 at 8.) Schwob then filed this lawsuit alleging breach of contract. (Doc. 2.) The court will evaluate the parties' summary judgment motions first and then move to the motions to strike.

## II. Standard

### A. Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### B. Motions to Strike

Federal Rule of Evidence 702, which controls the admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

3

Fed. R. Evid. 702. Under this rule, the district court must satisfy itself that the testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (*citing United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). The district court must first determine whether the witness is qualified by knowledge, skill, training, experience, or education to render an opinion. *Id.* If so, the district court must then determine whether the witness's opinion is reliable by assessing the underlying reasoning and methodology. *Id*. at 1283. The court is not required to admit opinion evidence that is "connected to existing data only by the ipse dixit of the expert," and may exclude the opinion if "there is simply too great an analytical gap between the data and the opinion offered." *Id*. (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). But the rejection of expert testimony is the exception rather than the rule, and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 596 (1993).

"The court has discretion to determine how to perform its gatekeeping function under *Daubert*." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig*., No. 17-MD-2785-DDC-TJJ, 2020 WL 1164869, at *3 (D. Kan. Mar. 10, 2020) (citing *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019)).

### III.    Analysis

Schwob moves for summary judgment on its claim of breach of contract and moves for summary judgment on Matrix's breach of contract claim because it alleges Matrix has waived its claim. (Doc. 81 at 7, 14.) In its cross-motions for summary judgment, Matrix asks the court to find that it is not in breach and that Schwob has waived its claim to damages. (Doc. 87 at 13, 22.)

4

The court will address these arguments in turn before evaluating the parties' respective motions to strike.

### A. Summary Judgment

#### i. The Termination Provision

With respect to Schwob's breach of contract claim and its ability to recover unpaid costs after a termination for convenience, the parties vehemently disagree as to how this provision is to be interpreted. The court will first address Schwob's breach of contract claim. A breach of contract claim requires a party to prove the: "(1) formation of a contract; (2) breach of the contract; and (3) damages as a result of that breach." *Morgan v. State Farm Mutual Auto. Insur. Co.*, 488 P.3d 743, 748 (Okla. 2021). To determine whether a party has breached a contract as a matter of law, the court must ascertain the contract's meaning. Both parties submit that the meaning of the contract is a question of law that the court may properly answer on summary judgment unless it determines that the language is ambiguous. (Doc. 81 at 6.) Indeed, "under Oklahoma law, the interpretation of an unambiguous contract is a question of law for the courts."[1] *Pub. Serv. Co. of Oklahoma v. Burlington Northern R. Co.*, 53 F.3d 1090, 1097 (10th Cir. 1995) (citing *Ferrell Construction Co. v. Russell Creek Coal Co.*, 645 P.2d 1005, 1007 (Okla. 1982)) ("Whether a contract is ambiguous so as to require extrinsic evidence to clarify the ambiguity is purely one of law for the court, and the construction of an unambiguous contract is a matter of law for the court.").

It is well established that a court's "primary goal is to ascertain 'the parties' mutual intentions from the four corners of the contract.'" *Tufaro v. Oklahoma ex rel. Board of Regents of Univ. of Oklahoma.*, 107 F.4th 1121, 1132 (10th Cir. 2024) (quoting *Walker v. Builddirect.com*

---

[1] Under the general terms and conditions of the subcontract, the parties have agreed that Oklahoma law governs the interpretation and construction of the contract. (Doc. 81-2 at 18.)

*Techs. Inc.*, 349 P.3d 549, 554 (Okla. 2015)). The parties' intent is to be gleaned "from the entire agreement." *Id.* "If a contract is complete in itself and viewed in its entirety is unambiguous, its language is the only legitimate evidence of what the parties intended." *Whitehorse v. Johnson*, 156 P.3d 41, 47 (Okla. 2007). A reviewing court should not "create an ambiguity by using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on the provision," *id.*, nor "make a new contract to benefit a party []or rewrite the existing one." *Bonner v. Oklahoma Rock Corp.*, 863 P.2d 1176, 1183 (Okla. 1993).

Provisions in Oklahoma contracts are "to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." Okla. Stat. tit. 15 § 160. When possible "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others." *Id.* at § 157. Core to a court's reasoning must be the presupposition that the parties' intent is most reliably expressed by the language they use. *Id.* at § 154 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."). Under the doctrine of *contra proferentem*, a contractual uncertainty "should be interpreted most strongly against the party who caused the uncertainty to exist." *Id.* at § 170.

At the core of the parties' motions for summary judgment is the meaning of the subcontract's termination-for-convenience clause. (Doc. 81 at 6-13, Doc. 87 at 9-18.) The clause reads:

> Contractor may at its sole discretion, by written notice to Subcontractor, terminate this Subcontract, in whole or in part, for any reason whatsoever, or for no reason. Upon receipt of written notice from Contractor, Subcontractor shall cease all work immediately, and take all reasonable measures after consultation with Contractor, to terminate or assign to Contractor all subcontracts, purchase orders, or other commitments related to the Work or the Project on terms and conditions acceptable to Contractor. *Subcontractor will be paid*

> *all reasonable costs of all Work performed and materials furnished under the Subcontract prior to receipt of such notice, plus reasonable demobilization costs, including reasonable overhead and profit in accordance with this Subcontract.* In no event will Subcontractor be entitled to any payment or compensation whatsoever for interruption of business or any other items of consequential damage, for overhead or loss of profits on the unperformed work and/or services and unfurnished materials.

(Doc. 81-2 at 17.) (emphasis added). Schwob contends that the emphasized provision entitles it to recover all its costs and demobilization expenses subject only to a reasonableness inquiry, and reasonable overhead and profit in accordance with the terms of the subcontract. (Doc. 81 at 8.) Based on the pretrial order, Schwob has reduced its damages by the prior amounts paid by Matrix. (Doc. 90 at 22.) As Matrix did not pay these invoiced costs that were billed after termination, it allegedly breached the subcontract. (Doc. 81 at 8.) Matrix by contrast alleges: "Schwob's compensation following termination is determined by: (1) the value of the completed milestones under the 'Rules of Credit'; (2) the portion of the value of incomplete milestones under the 'Rules of Credit' that corresponds to Schwob's percentage of completion; (3) valid change orders; and (4) demobilization costs, which would include a reasonable profit and overhead amount for these costs." (Doc. 87 at 10.) Because it alleges that portions of Schwob's work was defective and it was permitted to back charge, Matrix argues that it need not pay Schwob as the amount of the back charges exceeds what it owes Schwob. (Doc. 87 at 13.)

Schwob's argument as to the provision's interpretation is mostly based on grammar. (Doc. 81 at 10.) Its position hinges on the application of the sentence's concluding phrase: "in accordance with this Subcontract." (*Id.*) Schwob contends that this restrictive clause only applies to "reasonable overhead and profit" but does not reach back to "reasonable costs of all Work performed and material furnished" or "reasonable demobilization costs." (*Id.* at 12.) Consequently, Schwob contends that it is entitled to recover all of its costs irrespective of the fixed contract price, the 'Rules of Credit,' or allocation of the fixed amounts in the contract allocated

7

towards the milestones. (*Id.*) According to Schwob, the only category of damages that is limited by the contractual payment plan is reasonable overhead and profit. As to those categories, reference to the fixed contract price and the corresponding milestones is required.

In support of its interpretation of the provision, Schwob relies upon the grammatical principle called the last antecedent doctrine, and Oklahoma courts have relied on it to decide cases. In *Tidal Oil Co. v. Roelfs*, 187 P. 486, 487 (Okla. 1920), the Oklahoma Supreme Court explained:

> A restrictive clause, however, must be set off by a comma, when it refers to several antecedents which are themselves separated by that point. It will be observed that in the provision under consideration the two antecedent clauses are separated by a comma. Under this rule, if the parties intended the restrictive clause to apply to both antecedents, they undoubtedly would have set it off by a comma.

*See also St. Louis-San Francisco Ry Co. v. Bengal Lumber Co.*, 292 P. 52, 53 (Okla. 1930); *James v. Beckwith*, 805 P.2d 117, 119 (Okla. Civ. App. 1990). Still, the Tenth Circuit cautions that overreliance on formalistic grammar rules in the contract context can be poor evidence of the parties' intent, as "contracting parties often break grammar rules." *Fuel Automation Station, L.L.C. v. Energera Inc.*, 119 F.4th 1214, 1229, n.15 (10th Cir. 2024) ("We consider grammar rules here in that vein: as a flexible tool that can give insight into the parties' intent and enlighten the 'plain, popular, and generally accepted meaning of the words employed—unless context shows otherwise."). Matrix further counters that the application of the last antecedent doctrine in this case would lead to an allegedly absurd result: Schwob collecting more than the full price of the contract because of its termination. (Doc. 96 at 19.) Schwob's compensation, however, is limited by reasonableness, which is a fact question for the jury. Schwob is correct as a matter of grammatical construction, but that is not the main reason the court in part grants its motion for summary judgment.

Schwob's position that it is to recover its reasonable costs is supported by the plain language of the subcontract. (Doc. 81 at 10-13.) Matrix argues that the provision should be interpreted as allowing Schwob to recover costs by determining the value of the complete and incomplete milestones in accordance with the "Rules of Credit." (Doc. 87 at 9-15.) This position is not supported by the language in the provision. Contra Matrix, the termination for convenience provision makes no mention of the "Rules of Credit" payment system. (Doc. 81-2 at 17.) Further, that provision is outlined in the purchase order. (*Id.*) Matrix contends that this "Rules of Credit" payment system is brought into Article 16.1 by the phrase "in accordance with the subcontract." (Doc. 87 at 11.) This argument fails because if "in accordance with the subcontract" brought the "Rules of Credit" payment system into the clause, it would render the phrase "will be paid all reasonable costs of all Work performed and materials furnished under the Subcontract prior to receipt of such notice" devoid of meaning. The termination provision at Article 16.1 does not mention milestone payments or rules of credit. It mentions costs. That, subject to reasonableness, is what Schwob is to be paid. The court notes however, that the reasonableness inquiry by its very nature will include consideration of the contract terms and surrounding context. Reasonableness is not merely a question in the abstract about what might be commercially reasonable but rather takes into account the circumstances of the parties' dispute. For example, if a contract provided the contractor would only be paid a certain amount for an expense, a party could not claim that the expense is reasonable merely because it reflected the market price. A proper reasonableness inquiry will consider the totality of the circumstances of the parties' dispute.

Schwob argues that its interpretation of the termination-for-convenience clause in essence "converts" the subcontract from a fixed price to a cost-plus model. (Doc. 81 at 13.) While this likely overstates the consequences of the language, the plain meaning of the contract terms does

9

suggest that what Schwob is owed changes when a termination for convenience occurs. *Compare* (Doc. 81-2 at 17 *and* Doc. 87-3 at 2.) This makes sense because, as Schwob points out, contractors may frequently incur large upfront investment costs prior to completing much work on a project. (Doc. 81 at 13.) If the clause merely allowed contractors to recover "milestone" completion payments as suggested by the "Rules of Credit" system, contractors would never be able to recoup those upfront investment costs if terminated for convenience early in the project.[2]

Finally, Matrix contends that other provisions of the subcontract limit Schwob's recovery. Specifically, it contends that incorporation by reference of the pipeline's prime contract changes the meaning of Article 16.1. (Doc. 96 at 21.) Essentially, Matrix argues that the termination provision in the prime contract controls because that provision conflicts with Article 16.1. The court is unconvinced. Matrix points to language in the Subcontract Special Terms and Conditions which says: "With respect to Subcontractor's Scope of Work to be performed as furnished hereunder . . . In the event of inconsistencies, ambiguities, or conflicts between the terms of the EPC Contract and the Subcontract General Terms and Conditions, then the terms of the EPC Contract shall apply. However, the terms of the EPC Contract and the Subcontract General Terms and Conditions shall be read and construed in harmony with each other to the fullest extent practicable." (Doc. 96-4 at 21). In the event of a conflict, the prime contract controls. (*Id.*) Included in the terms of the prime contract is a provision that explains the prime contractor, upon termination for convenience, is entitled to payment on the following basis: "to the extent Work is

---

[2] Relatedly, Matrix argues that "it cannot have been the parties' intention" for Schwob to be owed more under a termination for convenience than the value of 50% of the work they have completed. (Doc. 96 at 20.) Courts inquire into the intent of the parties to resolve *what the language of the contract means*, not necessarily what the eventual consequences of that language are. *See Hicks v. Mid-Kansas Oil & Gas Co.*, 76 P.2d 269, 271 (Okla. 1938) ("[A] contract must be interpreted as to give effect to the mutual intention of the parties at the time of contracting, and in so doing the language of the contract governs if it is clear and does not involve an absurdity, and the intention of the parties to a written contract is to be ascertained from the writing alone, if possible, and the whole of the contract is to be considered for this purpose.").

terminated before Contractor fully completes a Milestone, Contractor shall be entitled to payment on a prorated basis commensurate with the percentage of the Milestone that Contractor completed at the time of termination." (Doc. 96-3 at 9.) Matrix contends these terms conflict with the subcontract terms and therefore, the prime contract terms must control. (Doc. 96 at 21.)

This argument is unpersuasive because the reach of the clause incorporating the terms of the prime contract is limited to the project's "Scope of Work." (Doc. 96-4 at 21.) The termination-for-convenience clause is included in the Subcontract General Terms and Conditions, not the Scope of Work and as a result, the termination for convenience clause stands unmodified by the terms of the prime contract. (Doc. 96-4 at 6.) A contrary result would hollow out the parties' bargaining over the subcontract's general terms.

The consequence of this interpretation is that Schwob is entitled to recover its costs, subject to reasonableness, as provided by Article 16.1. Whether an outcome where Schwob recovers more than the total cost of the contract would be absurd as a matter of law is not a question this court needs to answer. Reasonableness is a fact issue for trial, subject to some limits. 88 C.J.S. Trial § 343. Moreover, the parties currently dispute what the total value of the contract is; accordingly, that issue must also be left for trial. (Doc. 95 at 7.) Therefore, the court will not decide at summary judgment whether Schwob's claimed costs are reasonable, absurd, or exceed the value of the subcontract. Schwob is entitled to receive its costs, subject to reasonableness, under Article 16.1 of the subcontract's general terms and conditions. Schwob's recovery of costs will be limited, however, due to the release of claims executed by Schwob as discussed below.

    ii.    *Releases*

Matrix alternatively argues that Schwob released any claim for costs related to prior work for which Schwob was paid and executed a release. (Doc. 87 at 22-27.) At each milestone payment mark, Schwob executed a release that states:

> [T]his document becomes effective to *release any mechanic's lien right, any right arising from a payment bond right, any claim for payment, and any rights under any similar ordinance, rule, or statute related to claim or payment rights* for persons in the signer's position that the signer has on the PROJECT and/or property of the OWNER at the above described LOCATION *to the following extent: labor, services, equipment, or material included in progress payments requests and furnished to the PROJECT through 11/14/2021* [end of payment period]."

(Doc. 87-8 at 5.) (emphasis added). Matrix argues that this language means that Schwob has released any claim for payment on the project through the date of the last release: November 14, 2021. (Doc. 87 at 22-27.) The project continued its work until December 2021, its "winter break," due to the weather in northern Colorado. (Doc. 87 at 11; Doc. 95 at 6.) Before the project resumed, Schwob was terminated. (Doc. 81-3 at 2-3.)

Schwob's arguments to preclude application of the signed release are unpersuasive. First, Schwob argues that because of its internal accounting practices, there is no way to "trace the effect of the releases on specific items in the final invoice." (Doc. 96 at 18.) But Schwob's internal accounting practices do not affect the language in the releases. Furthermore, if Schwob was concerned that "much of the work it had completed towards the Rules of Credit milestones" would not be paid, "because almost every milestone required 100% completion" to be billable, it should have insisted on changes to the release language. (Doc. 95 at 19.)[3] Schwob makes no further arguments on the enforceability of the releases. It is clear that the release precludes any claim for payment for labor, materials, or work performed that were billed under the progress payments. (Doc. 87-8 at 5.) As a result, because it signed releases, Schwob may not seek costs on the project

---

[3] Schwob also argues that its termination for convenience "abrogated" the language in its releases. For this proposition it cites no authority and no language from the contract supporting this interpretation. As a result, the argument fails.

that were billed up to its last release on November 14, 2021. This means there is a small window of time for which outstanding, unreleased claims for costs may be recoverable under the termination-for-convenience provision. That said, there may be costs that were not included in the progress payments and therefore are not covered by the releases, including change orders. (Doc. 95 at 18-19.)

### B. Matrix's Counterclaim

Matrix also filed a counterclaim against Schwob. (Doc. 31.) It alleges that Schwob breached the subcontract by supplying defective work, failing to turn over quality control documents, failing to pay its subcontractors, and failing to assign its subcontractors to Matrix after termination. (*Id.* at 3-7.) Schwob filed a motion for summary judgment on Matrix's counterclaim, asserting that Matrix had waived its right to sue by terminating Schwob for convenience rather than default. (Doc. 81 at 14-15.) Matrix disagrees and argues that it is not estopped from pursuing, and has not waived, claims against Schwob for breaches of the subcontract. (Doc. 96 at 23-24.)

At heart, Schwob argues that Matrix has waived its claims to damages for Schwob's alleged breach because Matrix terminated Schwob for convenience. (Doc. 81 at 14.) "A waiver is defined as the voluntary or intentional relinquishment of a known right." *Chandler v. State ex rel. Dep't of Pub. Safety*, 419 P.3d 298, 310 (Okla. Civ. App. 2017) (citing *Faulkenberry v. Kansas City Southern Ry. Co.*, 602 P.2d 203, 207 (Okla. 1979). Unlike a termination for default, a termination for convenience does not afford the terminated party the opportunity to cure any defective work. *Compare* Doc. 96-4 at 14-15 to Doc. 96-4 at 17.

While the court must give effect to all provisions of a contract, Okla. Stat. tit. 15 § 157, Plaintiff points to no provision of the subcontract that shows Matrix waived its rights to a claim for damages for defective performance or any other breach set forth in Matrix's claims. In fact,

13

the termination-for-convenience clause explicitly provides that: "Contractor may at its sole discretion, by written notice to Subcontractor, terminate this Subcontract, in whole or in part, *for any reason whatsoever, or for no reason.*" (Doc. 81-2 at 17.) (emphasis added). This language belies Schwob's implication that Matrix must use the termination-for-default clause when terminating and seeking recovery for defective performance. (Doc. 97 at 9.) Accordingly, Matrix has not waived its counterclaim. On this issue, Schwob's motion for summary judgment is denied.

**C. Motions to Strike**

*i.   Richard DuCarme*

Matrix has proffered Richard DuCarme as an expert witness to testify about costs incurred by Matrix as a result of Schwob's allegedly defective work. (Doc. 83-1 at 2.) Schwob has moved to strike Mr. DuCarme's testimony in its entirety due to alleged gaps in Mr. DuCarme's expert report. (Doc. 83 at 2-3.) Specifically, Schwob argues that Mr. DuCarme did not disclose "work papers" that he refers to in his deposition and allegedly relied upon in his report. (*Id.*) As Matrix explains, these "work papers" are excel spreadsheets that Mr. DuCarme created to organize the underlying factual record for his review. (Doc. 100 at 2.) Failure to disclose these documents, according to Schwob, violates Federal Rule of Civil Procedure 26. (Doc. 83 at 2-3.) Schwob further contends that the violation has prejudiced it in such an irreparable way that Mr. DuCarme's testimony must be excluded in its entirety. (Doc. 83 at 14-17.)

The court will deny Schwob's motion because Mr. DuCarme's disclosures likely fall within the limits imposed by Rule 26. An expert report must be complete enough to allow the opposing party an opportunity to contest the analysis of the expert; this requires disclosure of the materials the expert relied upon in reaching his opinion. Fed. R. Civ. P. 26 (a)(2)(B)(ii). "It is not sufficient that an expert report merely set forth the opinions the expert will offer; 'it must also describe the

14

reasons and basis for those opinions.'" *Perry v. Safeco Ins. Co. of Am.*, No. 18-CV-539, 2020 WL 1166087 at *4 (N.D. Okla. 2020) (citing Rule 26 Committee Note).  As explained below, Mr. DuCarme disclosed the documents he relied upon to Schwob, the undisclosed excel spreadsheets are merely summaries of the documents he relied upon.

Mr. DuCarme's report contains various citations to underlying bates-numbered documents (Doc. 83-3.) and an exhibit list that includes "documents contained in Vory's Relativity database which houses all documents produced in this action." (*Id.* at 113.)  Mr. DuCarme has declared in a signed affidavit that the "work papers" he referenced are comprised of the exhibits in his report, the underlying data and documents produced in the litigation, one unproduced email and most importantly "two excel documents which copies, inserts, and aligns vendor and labor data with the cost entries in Matrix's costs report *for ease of viewing and reconciliation.*" (Doc. 100-2 at 2-3.) As a result, Mr. DuCarme did not breach Rule 26 by failing to disclose the "work papers."

Even if the disclosures did fall below the Rule 26 standard, Schwob must have suffered sufficient prejudice to warrant the expert's exclusion. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 952 (10th Cir. 2002) ("Rule 37(c) permits a district court to refuse to strike expert reports and allow expert testimony even when the expert report violates Rule 26(a) if the violation is justified or harmless."). The Tenth Circuit instructs district courts that they "need not make explicit findings concerning the existence of a substantial justification or the harmlessness" but should consider certain factors. *Id.* at 953 (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)). Those factors are: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.*

As to the first factor, despite its protestations, Schwob was not surprised by the testimony offered because as Matrix points out, the underlying documents and data used to support Mr. DuCarme's report were already disclosed. (Doc. 100 6-7.) The previously undisclosed excel spreadsheets that Schwob contends "are the analysis," (Doc. 103 at 4), are more like summary exhibits which as Matrix explains "identify [] the bates numbers and reformat[] the information," (Doc. 100 at 2), from the discovery record. Second, whatever minimal prejudice Schwob did suffer was cured as Matrix produced the summaries shortly after Mr. DuCarme's deposition. (Doc. 100 at 3.) At this stage, Schwob has been in possession of these documents for nearly a year; this is ample time to prepare challenges for trial. Third, neither party claims that the introduction of Mr. DuCarme's testimony would disrupt the trial and the court also sees no reason that would be the case. Schwob's contention that the court would need to reopen discovery and shift the trial timeline is unfounded. Finally, Schwob does not argue bad faith or willfulness on the part of Matrix and the court sees no evidence of such bad faith. Accordingly, because Mr. DuCarme's report likely complied with Rule 26 and the non-disclosure was relatively harmless, Schwob's motion to strike the testimony of Mr. DuCarme is denied.

Additionally, because Matrix has succeeded in its defense of Mr. DuCarme's testimony, its motion to strike a portion of Schwob's reply brief (Doc. 103) regarding the underlying motion to strike is denied as moot.

    ii.    *Michael Patena*

Matrix has proffered Michael Patena as an expert witness to testify in this case. (Doc. 83-1 at 4.) Mr. Patena was an employee of Matrix when this litigation began and left the company but continued to support the litigation. (Doc. 84 at 1.) During Mr. Patena's deposition, counsel for Schwob allegedly first learned that Mr. Patena was no longer an employee of Matrix. (*Id.* at

3.) In Schwob's eyes, this changes Mr. Patena's status as an expert witness and subjects him to more stringent disclosure requirements associated with retained experts. (*Id.* at 33.) Because Matrix failed to designate Mr. Patena as a retained expert and make the required disclosures, Schwob argues that Mr. Patena's testimony should be stricken. (*Id.* at 4-5.) The court disagrees.

Under FRCP 26, expert witnesses fall into two categories: retained and non-retained. Fed. R. Civ. P. 26 (a)(2)(B). Retained experts are those that are brought into a case for the purpose of supporting litigation. *Id.* Non-retained experts are witnesses that have a factual connection to the case but also happen to be an expert. *Id.*; *see also Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1, 7 (1st Cir. 2011) ("[W]here, as here, the expert is part of the ongoing sequence of events and arrives at his causation opinion during treatment, his opinion testimony is not that of a retained or specially employed expert. If, however, the expert comes to the case as a stranger and draws the opinion from facts supplied by others, in preparation for trial, he reasonably can be viewed as retained or specially employed for that purpose, within the purview of Rule 26(a)(2)(B).") (internal citations omitted). A retained expert is required to produce a written report containing certain information. *Id.* at 26 (a)(2)(B)(i) – (vi). A non-retained expert is not required to produce such a report. *Id.* at 26 (a)(2)(C)(i) – (iii).

Because Mr. Patena's relevance to the events of the contractual dispute renders him a non-retained expert, Matrix need not produce a report pertaining to his testimony. Contrary to Schwob's contentions, Mr. Patena's status as a non-retained expert turns not on his employment, but rather on his ties to the underlying facts of the dispute. *See Downey*, 633 F.3d at 7. Therefore, Mr. Patena's change in employment is irrelevant and Matrix was not under a requirement to produce a report when Mr. Patena left his job. Therefore, Schwob's motion to strike Mr. Patena's testimony is denied.

### iii. Harlan Smith

Schwob has proffered its CEO, Harlan Smith, to testify about the costs Schwob incurred on the project. (Doc. 85-1.) Matrix contends that his testimony should be excluded because it is improper expert testimony. (Doc. 85 at 1.) Schwob disagrees and claims that Mr. Smith's testimony is merely lay testimony arising out of Mr. Smith's direct experience with the business. (Doc. 101 at 3-4.) A lay witness's testimony is cabined to matters that do not "express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979). A lay witness may only testify if "his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (quoting *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 460 (5th Cir. 1996)). More technical and complicated subjects like "sophisticated economic models . . . 'concern[ing] moving averages, compounded growth rates, and S-curves'" are outside the purview of a lay witness. *James River Ins. Co. v. Rapid Funding L.L.C.*, 658 F.3d 1207, 1214 (10th Cir. 2011) (quoting *Telebank*, 374 F.3d at 929).

But Mr. Smith plans to testify about something much milder: the costs that Schwob incurred during its conduct under the subcontract. (Doc. 101 at 6.) This is a fact question, and one that Mr. Smith surely has direct exposure to as the CEO of the company. Courts have permitted this kind of testimony by lay witnesses. *Ryan Dev. Co., L.C. v. Indiana Lumbermens Mut. Ins. Co.*, 711 F.3d 1165, 1170 (10th Cir. 2013) ("The advisory committee notes to Rule 701 explain that 'most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.'") Mr. Smith will be permitted to testify on this subject

18

as a lay witness because his testimony will likely be limited to "basic arithmetic, personal experience, and no outside expert reports." *Id.* Accordingly, Matrix's motion to strike the testimony of Harlan Smith is denied. However, at trial Matrix may object to testimony that it perceives wanders outside the confines of lay testimony and into the morass of expert opinion. The court will take up those objections at that time.

### IV. Conclusion

For the foregoing reasons, Schwob's motion for partial summary judgment (Doc. 81) is GRANTED IN PART and DENIED IN PART, Matrix's motion for partial summary judgment (Doc. 87) is GRANTED IN PART and DENIED IN PART, Schwob's motions to strike (Doc. 83, 84) are DENIED, Matrix's motion to strike (Doc. 85) is DENIED, and Matrix's motion to strike a portion of Schwob's reply brief (Doc. 104) is DENIED as moot.

A telephone pretrial conference is set for January 21, 2026, at 11:15 a.m. Parties shall dial Conference Number: 316-402-0044 Conference ID: 126 186 250.

IT IS SO ORDERED. Dated this 12th day of January, 2026

s// John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE